IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. DAVIS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MARK A. DAVIS, APPELLANT.

Filed August 6, 2024.    No. A-23-614.

Appeal from the District Court for Colfax County: CHRISTINA M. MARROQUIN, Judge. Affirmed.

Erik C. Klutman, of Sipple, Hansen, Emerson, Schumacher, Klutman & Valorz, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, Melissa R. Vincent, and Emily Doll, Senior Certified Law Student, for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Following a jury trial, Mark A. Davis was convicted of four felonies in the district court for Colfax County related to his selling and possession of methamphetamine. On appeal, he assigns the district court erred in excluding a purported exculpatory video of his brother admitting to the crimes. He also assigns that his trial counsel was ineffective in a variety of ways. For the reasons that follow, we affirm.

## II. BACKGROUND

From April 19 to May 5, 2021, law enforcement conducted three controlled buys of methamphetamine with the help of a confidential informant. The confidential informant was given

money by law enforcement to buy 1.75 grams of methamphetamine from a woman he knew to be a dealer, Robin Kortan. During these controlled buys, Davis was present in the house. After the third controlled buy, law enforcement obtained a search warrant for the residence. While serving the warrant, law enforcement found 9 grams of methamphetamine on the main floor of the home and .14 grams of methamphetamine in the basement where Davis stayed.

Davis was arrested and taken to the police station for an interrogation. Over the course of the roughly 57-minute interview, Davis told the investigators that he started using methamphetamine several months prior and supplied Kortan with the drugs that she sold. He later clarified that he would buy the methamphetamine, give it to Kortan to sell, and only reinvolve himself when her supply was running low.

On July 10, 2022, Davis was charged with four felonies. Three of the counts were Class II felonies for the delivery of a controlled substance and/or aiding and abetting delivery of a controlled substance – methamphetamine. The fourth count was for possession of a controlled substance – methamphetamine, a Class IV felony. Davis' trial was set for January 25, 2023.

## 1. OFFER OF PROOF

On January 9, 2023, Davis sent a video to the State that depicted his brother, Jacob, implicating himself in the drug transactions. In the video, Jacob indicated the recording was made on January 8. He then claimed that he was the one who sold the drugs to Kortan, that Davis was not involved in the transactions, and that Davis only confessed because he did not want Jacob to get into trouble.

On January 13, 2023, the State filed a motion in limine to exclude the video from trial. In the motion, the State outlined its attempts to contact Jacob. It first stated that an investigator attempted to contact Jacob but was told by his attorney to not speak with him until his attorney had an opportunity to speak with him first. As of the time the motion was filed, the investigator had not heard back from Jacob's attorney. The State then sought Jacob's contact information from Davis' attorney and was told that Davis did not have Jacob's current address or phone number. The motion then argued that because the State had been unable to contact Jacob, had no reasonable means to contact him prior to the start of trial, and no other evidence implicated him in the charges, the video should be excluded.

A hearing was held approximately 4 hours after the State filed its motion in limine. Davis' counsel objected to the proceeding claiming that he had less time than the State to prepare because he was only served with the motion 2 hours prior. The court overruled the objection because it believed the matter needed to be settled quickly for the parties to prepare for trial. Davis' attorney argued that the video should not be excluded because he disclosed the video to the State within 2 hours of receiving it and even if Jacob was unavailable, the video could be admitted under Neb. Rev. Stat. § 27-804(2)(c) (Reissue 2016) because Jacob's statements were against his pecuniary interests. The State argued the motion should be granted because the parties had known the trial date for at least a month and despite Davis being the one who provided the video to his attorney, he was unable to provide any information on how to contact Jacob. The court granted the motion in limine reasoning that trial was in less than 10 days, nobody had located Jacob or issued a subpoena for his presence at trial, and there was nothing in the record that indicated he would attend the trial. It continued to find that even if Jacob appeared at trial, receipt of the video would

prejudice the State because it lacked sufficient time before trial to conduct a deposition or further investigation. Earlier in the hearing the court also indicated the motion should be granted because without Jacob's presence at trial there would be insufficient foundation to admit the video into evidence. The court concluded that even though it was sustaining the motion, it would address any change in circumstances within the upcoming week.

On January 17, 2023, Davis moved to continue the trial based on the newly discovered evidence, which the court granted. On April 21, the court issued a subpoena for Jacob to be deposed on May 1. There is no indication that Jacob was ever found, so accordingly this deposition never occurred.

Davis' jury trial began on May 8, 2023. Once the State rested its case, Davis offered Jacob's video as exhibit 23 as an offer of proof, which the court received. The court also affirmed its ruling on the motion in limine, concluding that the video would lack foundation in a way that prejudiced the State because it did not have an opportunity to cross-examine, review, or confirm the veracity of Jacob's statements.

## 2. Trial

At the trial, the State called four witnesses: Investigator Ron Kosiba, former investigator Keith Bignell, its confidential informant, and Kortan.

Kosiba works for the Nebraska State Patrol and has worked there for 33 years. In this time, he has spent roughly 22 years investigating drug crimes and has been a part of more than 500 investigations. He discussed his history of working with confidential informants and conducting controlled buys. He explained that during controlled buys the confidential informants wear a recording device while they attempt to buy drugs from their dealers. The money is provided by law enforcement and can be traced by the bills' serial numbers.

Kosiba stated that he met the confidential informant in this case after he was arrested for a probation violation and given an opportunity to assist law enforcement. After the informant was released from jail, he called Kosiba and they made arrangements for him to purchase 1.75 grams of methamphetamine from Kortan. The informant conducted three controlled buys on April 19, April 27, and May 5, 2021. During each controlled buy the informant was able to record the conversations he had during the transactions.

On May 6, 2021, based on the information obtained from the informant, Kosiba served a search warrant on Kortan's residence. Law enforcement found 9.32 grams of methamphetamine and drug paraphernalia in the upstairs area next to Kortan's recliner. They also discovered one baggie that contained .14 grams of methamphetamine in the basement where Davis resided. Davis was then arrested and interviewed at the police station.

Bignell also testified at trial. At the time of trial, Bignell no longer worked for the Nebraska State Patrol, but he had worked there for 27 years and was the one who interviewed Davis after his arrest. Bignell stated that throughout his career he had spent 21 years working as a drug investigator and had participated in over 1,000 drug investigations.

In Davis' interview with Bignell, Davis stated that he moved in with Kortan around Thanksgiving of 2020 after he got divorced and began using methamphetamine around the same time. He started using it more frequently in January and February 2021, and stated that he initially bought his methamphetamine from someone in Columbus named Tammy. He said that on six or

seven occasions he bought "8 balls" from Tammy, which is approximately 3.25 grams of methamphetamine. However, in March or April, he began getting his methamphetamine from a woman named Tracy who lived in Omaha. He stated that Tracy would sell him an ounce at a time, or a little over 28 grams, for around $700. He told Bignell that he had made approximately 10 such purchases from Tracy. Davis told Bignell that he gave the methamphetamine to Kortan to sell and that she would tell him when she needed more, at which time he would arrange another pick up from Tracy. He continued to tell Bignell that in exchange for supplying the methamphetamine Kortan would assist him with various bills.

The confidential informant also testified at trial. He explained that he agreed to be an informant after Kosiba approached him at the county jail. He stated that he did not get any deal for being an informant and only wanted to do it out of his desire to get clean and cut ties with that part of his life. He testified that he had known Kortan for approximately 12 years and used to be her dealer. He knew that she was mostly immobile, and that Davis had been living with her for the past several months. He stated that he arranged the controlled buys by messaging Kortan via Facebook messenger.

On April 19, 2021, the informant conducted the first controlled buy. When he was pulling up to Kortan's residence, he noticed that Davis' truck was in the driveway. When he entered the house, he said that Kortan was in a recliner in the corner of the room and Davis was on the couch playing a game on his phone. He handed Kortan the money and she handed him the drugs in a clear plastic baggie. Because the informant was trying to remain sober, he asked that in the future Kortan put the drugs in a non-translucent container, so that he did not have to see them. The informant and Kortan then started discussing who the drugs were for because the informant had told her that they were not for him. He stated that it was for his friend, "Andy" and that Davis knew him. Davis then chimed in indicating that he knew Andy and that the transaction was okay. The informant testified that he had "no doubt" Davis knew that he was there to buy drugs from Kortan.

The second controlled buy occurred on April 27, 2021. When the informant entered the residence Kortan was in her chair and Davis was on the couch. The informant handed Kortan the money and she gave him the drugs in a cigarette package. Before he left, he talked with Davis about remote control cars that Davis built. The informant stated that Davis was in the room the entire time and was able to see the transaction between him and Kortan take place.

The third controlled buy occurred on May 5, 2021. This time, in addition to Kortan and Davis being present, another individual, Jeff Kluck, was there. When the informant entered the residence, Kortan was in her chair talking to Kluck. The informant gave Kortan the money and she gave him a cigarette package containing the drugs. After a few minutes, Davis appeared from the bathroom and joined the conversation. The informant stayed in the house for approximately 15 minutes listening to Kluck tell a story and when he left, Kluck told him, "Thanks for helping out." The informant interpreted this to mean that he was helping Kluck by buying his methamphetamine. He then testified that Davis had to have been aware of the drug transaction because he knew that he was coming over.

Kortan then testified and stated that Davis lived with her from January until May 6, 2021, when the warrant was executed. She stated that her and Davis used methamphetamine together and that Davis supplied her with more drugs to sell. She testified that she did not start selling

methamphetamine until Davis moved in with her. She indicated they always bought the drugs together and pooled their money to do so. She explained that Davis brought the drugs to her house and then she sold them.

After the warrant was executed on May 6, 2021, Kortan was interviewed and told the police that Davis was the one supplying her with the drugs to sell. She eventually pleaded no contest to three counts of delivery of methamphetamine and one count of possession with intent to deliver in relation to the three controlled buys. She stated that she was able to enroll in a "problem solving court" which would expunge her record upon successfully completing the program.

Sometime after her initial interview with law enforcement, Kortan called the prosecutor and told her that Davis did not bring drugs to her residence. Kortan testified that this was a lie, and that she had told the prosecutor this because she did not want Davis to get in trouble. She stated that she admitted to the lie almost immediately afterward because she realized that the problem solving court would not help her if she continued to lie.

Davis then testified at trial and denied any involvement in the drugs found at Kortan's house. He stated that he did not initially know that Kortan used drugs and had never seen her sell drugs. He also said he never supplied her with drugs and testified that none of the property found in the search was his. He claimed to have lied during his interview because the police threatened him. He claimed the police told him to do exactly what they said or else he would be taken back to jail. He also said he lied to protect Kortan.

On cross-examination, he was asked how he knew how much an ounce of methamphetamine would cost if he had never bought or used it. He claimed that his estimation of $700 per ounce was a lucky guess. Notably, prior in the trial Kosiba stated that at that time the market value of an ounce of methamphetamine was roughly $700 to $1,000 and Kortan testified that the amount of methamphetamine Davis brought her would cost somewhere around $600 but would fluctuate regularly.

The matter was then sent to the jury, which returned guilty verdicts on each count. A presentence investigation report was ordered, and sentencing was held on July 19, 2023. The court sentenced Davis to 2 to 5 years' imprisonment on counts I, II, and III and 1 to 2 years' imprisonment on count IV, all to be served concurrently. Davis now appeals.

## III. ASSIGNMENTS OF ERROR

Restated and consolidated, Davis assigns the district court erred in sustaining the State's motion in limine and sustaining the State's objection at trial to exhibit 23, his offer of proof.

Davis also assigns that his trial counsel was ineffective for (1) failing to object to the speculative testimonies and improper opinions of Kortan and the confidential informant; (2) failing to rigorously cross-examine the State's witnesses; and (3) failing to depose Kortan and the confidential informant prior to trial.

## IV. STANDARD OF REVIEW

Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024).

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirements. *State v. Warner*, 312 Neb. 116, 977 N.W.2d 904 (2022); *State v. Betts*, 31 Neb. App. 737, 989 N.W.2d 441 (2023). An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

### 1. OFFER OF PROOF

Davis' first two assignments of error relate to the exclusion of the video that displayed Jacob taking responsibility for selling the drugs. His first assignment concerns the granting of the State's motion in limine and the second concerns the actual exclusion of the video at trial.

However, while Davis assigns both errors, he fails to provide an argument for the second assignment regarding the exclusion of the video at trial. To be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue the error in the party's initial brief. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023). An appellate court will only address assignments that are both assigned and argued. See *Seid v. Seid*, 310 Neb. 626, 967 N.W.2d 253 (2021). A claim insufficiently stated is no different than a claim not stated at all. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). Because Davis fails to provide an argument for his second assignment of error, we do not address that assignment. This leaves only his first assignment of error concerning the State's motion in limine before us.

With only Davis' assignment concerning the State's motion in limine properly raised, Davis fails to preserve the issue for appellate review. A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury. *State v. Vaughn*, 314 Neb. 167, 989 N.W.2d 378, *cert. denied*, 144 S. Ct. 241, 217 L. Ed. 2d 109 (2023). It is not the office of a motion in limine to obtain a final ruling upon the ultimate admissibility of the evidence. *Id.* Therefore, when a court overrules a motion in limine to exclude evidence, the movant must object when the particular evidence is offered at trial in order to predicate error before an appellate court. *Id.* An appellant who has assigned only that the trial court erred in denying a motion in limine has not triggered appellate review of the evidentiary ruling at trial. *Id.*

Due to the aforementioned inadequacies of Davis' appellate brief, only his assignment of error related to the State's motion in limine was preserved for appellate review. Because the overruling of a motion in limine, by itself, does not preserve the issue for appellate review, neither of Davis' assigned errors concerning his offer of proof are properly before this court. Accordingly, neither assignment of error can be addressed on appeal.

### 2. INEFFECTIVE ASSISTANCE OF COUNSEL

We next address Davis' assignments of error that his trial counsel was ineffective for failing to object to the speculative testimonies and improper opinions of Kortan and the confidential informant; failing to rigorously cross-examine the State's witnesses; and failing to depose Kortan and the confidential informant prior to trial.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Betts*, 31 Neb. App. 737, 989 N.W.2d 441 (2023). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Betts, supra*. To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Betts, supra*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

(a) Failure to Object to Speculative Testimonies and Improper Opinions

Davis assigns that his trial counsel was ineffective because he failed to object to testimony elicited from Kortan and the confidential informant where they testified about Davis' knowledge of the drug transactions. Davis essentially contends that these testimonies were improper because they were speculating about his purported knowledge of the events. Specifically, Davis takes issue with several statements by the confidential informant where he indicated that he had no doubt in his mind that Davis knew that Kortan was selling drugs, and that Davis knew a drug transaction was occurring during the third controlled buy. Regarding Kortan's testimony, Davis does not specify which statements were improper, but generally states that Kortan was allowed to testify about his knowledge that she was dealing drugs from the house. Davis argues that an attorney with ordinary training and skill in criminal law would have objected to the speculative testimonies and his attorney's failure to do so changed the result of the proceeding.

Neb. Rev. Stat. § 27-701 (Reissue 2016) allows for lay witnesses to testify in the form of opinions or inferences only when those opinions or inferences are rationally based on the perception of the witness and helpful to a clear understanding of his or her testimony or the determination of a fact in issue. See *State v. Anthony*, 316 Neb. 308, 4 N.W.3d 393 (2024). But it is clear that § 27-701 does not permit a lay witness to render an opinion based upon obvious speculation or conjecture. *Childers v. Phelps County*, 252 Neb. 945, 568 N.W.2d 463 (1997).

We first determine the record is sufficient to review these assignments of error on direct appeal. We further decide that these assignments fail because Davis is unable to demonstrate there was a reasonable probability the outcome of the proceeding would have been different if these statements had been excluded at trial. During the trial, the State presented substantial evidence against Davis. This evidence included testimony from the confidential informant and Kortan, both of whom implicated Davis in the drug transactions. This testimony was not only verified by the recordings taken by the confidential informant, but also by Davis' initial admissions to law enforcement. During his near hour-long interview with investigators, Davis detailed where he

bought the methamphetamine, admitted to supplying it to Kortan, and displayed accurate knowledge about its price. Moreover, a bag of methamphetamine was found in the basement where Davis resided. Given the weight of the evidence against Davis, we conclude that Davis was not prejudiced by his counsel's failure to object to the allegedly speculative testimony. Therefore, we determine these claims of ineffective assistance fail.

(b) Failure to Rigorously Cross-Examine State's Witnesses

Davis next assigns his trial counsel was ineffective for failing to rigorously cross-examine each of the State's witnesses. Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance. *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021). Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim. *Id.* We do not use perfect hindsight to criticize unsuccessful trial strategies or second-guess trial strategy. *Id.* However, the Nebraska Supreme Court has cautioned "that it is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal." *Id.* at 431, 966 N.W.2d at 855. Therefore, it has signaled that when the record is devoid as to why trial counsel chose not to ask specific questions, the record is often insufficient to address an ineffective assistance claim on direct review. See *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

*(i) Investigator Kosiba*

Davis assigns his trial counsel ineffectively cross-examined Kosiba by not asking him about the confidential informant's criminal history, who the drugs were bought from, who received the money from the drug transactions, and what Davis' level of participation was during the controlled buys.

While the record lacks any information as to why Davis' trial counsel chose not to ask Kosiba these particular questions, it is sufficient to note that Davis could never show he was prejudiced by his counsel not asking the questions presented. At other points in the trial, the information that Davis asserts could have been elicited from Kosiba was produced by other witnesses.

On direct examination, the confidential informant admitted to having several felonies. Despite Davis' claim to the contrary, his counsel could not have inquired further into the details of these convictions because when impeaching a witness with a prior felony conviction, the inquiry must end once the conviction is established as it is improper to inquire into the details. *State v. Stricklin*, 300 Neb. 794, 916 N.W.2d 413 (2018). Further, the informant testified about Davis' location during each controlled buy, what he was doing, and the conversations he had with him. More so, both the informant and Kortan discussed how Davis was not the one who sold the drugs and received the money. Instead, Kortan outlined the arrangement she had with Davis where she sold the drugs that he supplied her.

We conclude Davis' assignment of error alleging he was prejudiced by his trial counsel not rigorously cross-examining Kosiba fails because the information he alleges would have been gained by a more rigorous cross-examination was already presented at trial. Therefore, we cannot

say there was a reasonable probability that the outcome of the proceeding would have been different if Davis' trial counsel had asked Kosiba about the topics raised in this assignment.

### (ii) Kortan

Davis also assigns his trial counsel was ineffective for failing to rigorously cross-examine Kortan about her call to the prosecutor where she stated that Davis did not participate in the drug transactions. Additionally, Davis argues his trial counsel failed to impeach Kortan with her prior felony convictions.

Like the above analysis, we determine the record is sufficient to determine that Davis could never show he was prejudiced by these alleged errors of his trial counsel. During Kortan's direct examination, she testified about her call to the prosecutor where she claimed that Davis was not involved in the drug transactions. She admitted that she lied during that conversation to protect Davis. Additionally, although Davis does not specify which felony convictions Kortan should have been impeached with, she testified about her pleading no contest to three counts of delivery of methamphetamine and one count of possession with intent to deliver related to the drug transactions. With this information presented at trial, we cannot say there was a reasonable probability that the outcome of the proceeding would have differed if Davis' trial counsel inquired into the same information. Therefore, we conclude this assignment of error fails.

### (iii) Bignell

Davis also assigns his trial counsel was ineffective for failing to rigorously cross-examine Bignell about the incriminating statements Davis made during his interrogation. Davis takes particular issue with the fact that his trial counsel only asked Bignell five questions, none of which concerned his interrogation. However, Davis does not specify what questions his attorney should have asked to undermine his own admissions made during the interrogation.

In *State v. Mrza*, 302 Neb. 931, 935, 926 N.W.2d 79, 86 (2019), the Supreme Court set forth a requirement that "assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance." To satisfy this specificity requirement, the appellant "must make specific allegations of the conduct the appellant claims constituted deficient performance." *State v. Garcia*, 315 Neb. 74, 92, 994 N.W.2d 610, 644 (2023). A claim insufficiently stated is no different than a claim not stated at all. *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014). Therefore, when an ineffective assistance of counsel claim fails to meet the specificity requirements, the claim cannot be preserved for postconviction proceedings. See *id.*

We determine Davis failed to preserve this assignment of error because he failed to specifically identify how his trial counsel's cross-examination was deficient. Without any specificity as to what questions his attorney should have asked on cross-examination, we conclude that this allegation of ineffective assistance of counsel is insufficient. Therefore, we will not address this assignment of error and it is not preserved for postconviction review.

### (iv) Confidential Informant

Davis also assigns his trial counsel was ineffective for failing to rigorously cross-examine the confidential informant. During this cross-examination, Davis' attorney asked only one

question: "Sir, did Mark Davis ever sell you methamphetamine?" The informant responded, "No." Davis contends his attorney should have asked more than one question, inquired into the informant's involvement in the transactions, and impeached him with his prior felony convictions.

We determine the record is sufficient to determine that Davis could never show he was prejudiced by these alleged errors of his trial counsel. During the informant's direct examination, he admitted that he had multiple felony convictions and spoke at length about Davis' role in the transactions. He discussed where Davis was in the house during each controlled buy, outlined the conversations he had with him, and testified that Davis was not the one who sold him the methamphetamine. With this information already presented at trial, we cannot say there was a reasonable probability that the outcome of the proceeding would have been different if Davis' trial counsel had asked the informant about the same information concerning Davis' role in the transactions and reiterated that he had prior felony convictions. Therefore, we conclude that this assignment of error fails.

### (c) Failure to Depose Material Witnesses Prior to Trial

Davis next assigns his trial counsel was ineffective for failing to depose any of the State's witnesses. Specifically, he argues he was prejudiced by his attorney's failure to depose Kortan and the confidential informant. He asserts that the informant's deposition would have allowed for further exploration of his criminal history and Davis' involvement in the drug transactions. He then argues that Kortan's deposition would have allowed for greater investigation into the statements she made to the prosecutor.

We determine the record is sufficient to review this assignment of error on direct appeal and that Davis could never show that these alleged errors prejudiced him. During the informant's direct examination, he revealed that he had been convicted of multiple prior felonies. He also discussed Davis' role in each of the three drug transactions. He explained where Davis was for each controlled buy, what he was doing, and the conversations he had with him during the exchanges. Similarly, during Kortan's direct examination, she discussed the call she made to the prosecutor and explained that she told her erroneous information because she did not want Davis to get in trouble.

The record displays that the information Davis asserts would have been gained by deposing Kortan and the confidential informant was revealed at trial. With this, we cannot say there was a reasonable probability the outcome of the proceeding would have been different if Davis had deposed them. Therefore, we conclude this assignment of error fails.

### VI. CONCLUSION

We do not address Davis' assignments of error concerning his offer of proof because they are not properly before this court. We next determine the record demonstrated Davis could never show he was prejudiced by his counsel's failure to object to Kortan and the confidential informant's speculative testimonies because even if they had been excluded, there was not a reasonable probability that their exclusion would have changed the proceeding's outcome. We also determine Davis could never show he was prejudiced by his trial counsel's alleged failure to rigorously cross-examine Kosiba, Kortan, and the confidential informant because the information he claims would have been gained had already been presented at trial. Further, Davis failed to

- 10 -

preserve the assignment of error regarding the cross-examination of Bignell because he failed to specifically identify how his trial counsel's cross-examination was deficient. Lastly, we conclude Davis could never show he suffered prejudice by his trial counsel's failure to depose Kortan and the confidential informant because the information he claims would have been gained from the deposition was presented at trial.

AFFIRMED.